Madam Clerk, are we ready to go? We have three cases on the call today, so busy morning and we're looking forward to it. Thank you. 1529-93 International Brotherhood v. Illinois Labor Relations Board All right. Will all the attorneys that are here on this case step forward to the podium, please? The counsel will begin with you. Your name, please, for the record. Good morning, Your Honors. Nicole Cheney, International Brotherhood of Teamsters Local 700. Thank you. Good morning, Your Honors. Aaron Dozman on behalf of the Board. Kenneth Creighton on behalf of the Sheriff of the County. Okay. Before we begin this case this morning, we have a little, an issue that I want to discuss with the attorneys before we proceed. Rule 63 of the Illinois Supreme Court rules talks about disqualification of a judge if there may be some instance where the court has an interest in the case. Now, this is not that situation. There are mandated situations where a judge has to recuse him or herself if there is something of conflict. This is not that case, again, as I say, but this is a case of full disclosure. And we want to have the light shining in so everybody knows what's going on. We're wide open. We want everybody to know what's happening. And I've been advised by Justice Mikva that Mr. Dozman has served as our law clerk at one time. I'm advised this was, I believe, for a year and a half and was sometime around 2015. Now, again, pursuant to the rules does not create a per se conflict for Justice Mikva. But what the rule provides is when this kind of thing comes before the court, what the court should do is ask the attorneys to step out in the court hallway for a moment or two. If it takes you more than two minutes, we're going to call another case. But I'm not hurrying you. You can decide what you're going to do. No hurry. And you have to discuss amongst yourself if you think this fact that this young man served as a law clerk for Justice Mikva, was it 2015, sir? Yes. And for about a year and a half, is an issue that you are concerned about and you would ask her to recuse. It's not a problem for me, for any of us. If that does happen and one of you requests this to happen, perfectly fine. We're going to proceed with the argument today anyway. What we will do is have another judge come in and sit on the panel, read the briefs, listen to the argument, and then be part of the panel, so Justice Mikva would not. Again, no harm, no foul. For the sake of openness, this is how we proceed. So when we come back, Mr. Dozman, I expect to hear from you. You will tell us if anyone has an issue. And again, if they do, fine. If you don't, fine as well. So whatever you want to decide. So I'm going to ask you, if you would, all three of you to step outside. We'll give you a couple minutes. And let us know what your decision is, please, Mr. Dozman. You'll relate that to the court. Thank you. Thank you. What? What's the next case you're reading? Can we call it? No, just tell me what it is. It's Friedman v. City of Chicago. Oh, okay. Are lawyers here on that one? No. No, so we can't go in. You don't get the mic, do you? No. All right, so all proceedings on the record here. So Mr. Dozman, you and the other attorneys had a chance to discuss this. Is that correct? That's correct. There were no issues. No issues presented? No issues. Very well. Thank you very much for that report to the court. And so far, so long as you know, we're going to spend 15 minutes on argument today, each side. And will both of you be arguing? Yes, we'd like to split our time. You'd split your time? Then fine. All right. Counsel, are you ready to proceed? Yes, ma'am. All right. All done. Again, you're ready for the record, please, counsel. Nicole Chaney, C-H-A-N-E-Y. May it please the court, if I may, Your Honors, I'd like to reserve two minutes for rebuttal. Yes, fine. Thank you. First of all, I would like to thank you all for hearing our arguments today. I want to begin by laying out a roadmap of how I'm going to proceed with my argument. The union appealed from the Labor Board's ruling on the propriety of two workplace policies. You know, we know the facts, so the G.O. and the- Sure, right. So get to your argument. So the first order I'm going to address is the gang affiliation and disclosure form. Secondly, the rules of conduct order, specifically the social media provision. To my first issue on the gang affiliation order and the disclosure form, I'd like to start by dispelling the notion, I think that was kind of threaded throughout the briefs, that the union is somehow unconcerned with or unreasonable concerning the issue of gang activity and gang violence within the Cook County Sheriff's Office. We have always acknowledged that the sheriff has a duty to maintain the safety and security of his facilities. What benefit do you think the union could bring to that decision-making process? What do you think you could add to coming up with a better rule? Well, Your Honor, I think that that gets to the central city balancing test, the third prong of that. I have some hesitation in acknowledging that the benefits to the decision-making progress are where the weight of that part of the balancing test lies. I think that in the central city's case, they actually discuss the benefits to either side, the relative benefits to the employee versus the relevant burdens on the employer. So it's not really necessarily coming up with a better rule, but a rule that would be easier or better for employees to live with. Sure, and that honors the spirit and integrity of the Illinois Public Labor Relations Act, promotes bargaining and labor management relationships. So you think this general order, as far as the gang order, is a combination of the conditions of employment and the inherent managerial policy? Absolutely, absolutely. And I think we argued this in both our initial briefs and our reply briefs. The two first prongs of the central city test are answered in the affirmative. The third prong is a little bit hazier as it pertains to the board's balancing. The ALJ was pretty clear in her recommended decision and order about how she would have come out in the balancing of the burdens. But in the briefing before this court, Your Honors, it appears that the defendants are urging sort of a shirking of the central city's analysis by emphasizing that Section 4 of the Labor Act prohibits bargaining over inherent managerial policy powers. We'll talk to them about that. Because they do seem to be walking away a little bit from the central city test. But you're saying under that. Right, that's correct. Under that, we believe that the balance lies in favor of the union. And that's for a couple of different reasons. One of the reasons being that the sheriff presented no evidence of any burden to the department in bargaining. It didn't have to be an intense exchange. But some exchange at all would have at least helped to allay the concerns of the union and the membership in going forward with an order that has a tendency to increase the likelihood of discipline and that poses some sort of an investigative burden. The ALJ articulated that she didn't believe that the investigative burden was as severe as the union suggested. But that there was some investigative burden. And a dissenting member from the board, Richard Lewis, also recognized that there was some investigative burden on the employee. Counsel, let me ask you. There's some confusion as to the sheriff's stand as to are they bargaining? Do they say they would bargain? What's your understanding of that? Well, I think they sort of refuse to bargain by not responding at all. They do raise a contention that they never expressly refuse to bargain. But their silence in response to the union's request to bargain, in response to the union's request for dates that were amenable to discuss and meet for bargaining purposes, sort of speaks louder than words. They didn't even articulate that they would be willing to bargain until the hearing before the labor board. And that's a problem because if they are allowed to sort of fly under the radar there and not even recognize their duty to bargain until unfair labor practice proceedings are already in play, then that sort of does away with the integrity of the act. So what was at play at that table? Yes. Yes, Your Honor. And just getting back to the central cities test, I want to emphasize that Section 4 of the Labor Act does prohibit or prevent the union from urging or requiring the employer to demand a bargain over matters of inherent managerial policy. There are enumerated areas of inherent managerial policy in Section 4. And the central cities court, the Supreme Court, highlighted that there were some ambiguities between Section 4 and Section 10 of the act. And that was their balancing test, their adoption of the balancing test, which came from a number of other courts but was adopted by the United States Supreme Court in interpreting the National Labor Relations Act. And another case was their way of resolving those ambiguities between Section 4 and Section 10. So the history laid out in central cities is pretty useful in identifying how the balancing test comes into play. Counsel, can I ask you, did the sheriff present any evidence that there was some emergency involved or the conditions were so different that something had to be in place without going through bargaining? No, Your Honor. And that was part of the issue that we raised as well. There was no evidence presented that there was an urgent need to adopt this policy. Certainly, the subject matter on its own is a severe issue. It's a serious issue. But as the counsel or as the labor relations attorney for the sheriff admitted during his testimony at the board, there had been a historic way to discipline employees where there was a bona fide concern about gang affiliation in the past. This new policy widened the universe to new or should have known. And frankly, the labor board in adopting or essentially elevating the Illinois Street Gang Omnibus Prevention Act above the Labor Act, I think, overreached there. The should have known was in a prior order, was it not? I'm sorry? The language should have known was in a prior order in the sheriff's memo? There was some contention that the should have known language was in a prior order for the court services department, but not the Department of Correction or the Fugitive Warrants Department, which are the two bargaining units that I represent. But is that really a distinction? I mean, the language was used before in an order by the sheriff. It is a distinction because throughout the course of the life of the bargaining units, they're represented by various exclusive bargaining representatives. The language that is negotiated within the department is done by the exclusive bargaining representative. So if that language made its way into the guidelines governing the court services department, it doesn't necessarily follow that that would have been applied in the other departments. Let's get to the social media. Sure. Thank you. Moving on to the rules of conduct order and specifically the social media provision, there are some issues of first impression here. I think it's one large issue, but it's kind of bifurcated into two sub-issues, which is whether the maintenance of an unlawful work rule can be an unfair labor practice under Section 10A1, and whether the social media rules, if they chill protected speech, how that falls into an analysis under the Labor Relations Act and whether that can be considered an unfair labor practice. There's also a question, isn't there, as to whether this rule chills protected speech? I think, yeah, that would be the third question. And the board disposes of the ALJ's theory here, excuse me, disposes of the ALJ's ruling here on the basis that there was no change to the status quo. But that is under a unilateral change theory for an argument of a violation of 10A4. It has some relevance, doesn't it, in the sense that if we're going to the question of whether the union members felt chilled in their speech, the way a previous rule had been enforced for years and years and years would give them some assurance that they wouldn't be punished for protected conduct. It might. And the reason why I say that is because there are actually, there's a three-prong analysis as to whether a rule chills, whether a rule, the maintenance of a work rule would chill speech. And that's one of the prongs, which is. And that's the one they're relying on here. I mean, that's the one you're relying on here, isn't that? No, actually, the one that we relied on and the one that the ALJ ruled in our favor on was whether, well, actually, sorry, I misspoke a little bit. The one that the board relied on is whether it had been historically applied to restrict speech. And the one we relied on is whether it had a reasonable likelihood to be enforced. If you were afraid, you were afraid to be punished until your speech was being chilled. Correct. Correct. And I think that we can all recognize, just as members of the general public, the Internet has changed a lot since the rules of conduct order in 3.8 were codified. And the Internet has expanded grossly. Social media specifically. About the Lutheran heritage, does that apply to this case? I'm sorry? The sheriff seems to suggest, or your opponent seems to suggest, that the Lutheran heritage analysis should not apply here or hasn't been accepted by the various board rulings. What's your opinion about that? The Lutheran heritage case and also, excuse me, I can refer. The other case that was, that sort of preceded that. Let me. You can just talk about Lutheran heritage. Okay, sure. Yeah, the Lutheran heritage case is an NLRB case. So the dependent defendants do suggest that that should not apply here, that it does not apply here. My response would be to that is that the National Labor Relations Board has been looked to as persuasive authority in pretty much every arena of application with respect to the Illinois Public Labor Relations Act. And that is even further supported by my first argument on the game order with the Central Cities Balancing Test. They look specifically to what the National Labor Relations Board did. The Illinois Supreme Court looked to what the National Labor Relations Act said and how the United States Supreme Court resolved an issue under that act. So to suggest that it is not relevant or not applicable would be a stretch. It's not binding, but it is absolutely persuasive and it has been applied to help construe all areas of the Labor Act. As the ALJ noted in her expansive five-page analysis of the various case law that expounds upon these rules, the maintenance of unlawful work rules and how these matters have been resolved. I want to ask you a second question, counsel. As far as the issue of the conduct unbecoming language, I know that was relied on by the ALJ, but what was the board's position on that? The board... Or they would consider it. On the rules of conduct? Yeah, under the social media. So my understanding is that you want to know how the board, you understand the way that the ALJ ruled on that, but you want to know how the board ruled on that. They seem to disagree that there was a material change to the status quo based on what I was speaking about in response to Justice Mikva's question, that because there had been no prior instances or evidence of prior discipline relating to that, that it would be unreasonable for the employees to now say that it could chill speech. But because of the fact that we're talking about an entirely different forum, and this is not a small forum, it's not suggesting that just because a rule applies in the jail that it now also applies in the courthouses. We're talking about something that applies to off-duty conduct on the Internet, which is always in writing. It's communication, but it's always in writing. So the likelihood of discipline resulting is far more increased by the forum itself in the manner of the forum, which is individuals communicating with one another on social media accounts, whether it be Facebook or Twitter or LinkedIn or various social media accounts. So the purpose of those fora is to communicate with one another, discuss workplace issues, and if it is implied to restrict that activity, it's certainly a restriction of speech. Okay. So if we're talking about the problem of loose inheritance, of whether employees would reasonably construe the language to prohibit protected conduct,  Yes. tell me how the rule does that, because that's where you lose me a little. Okay. Because it seems to me the rule is really looking at discrediting integrity. It's looking at lying. That's what the rule, and that's always been prohibited. Correct. And that's always been true, and it's always been true in speech. So if you lied in the newsletter, if you lied anywhere, that would have been prohibited under the rule. I would agree with that. If you lied anywhere, it would have been prohibited under the rule. I think that the reasonableness comes into sort of a question of whether an employee has a reasonable interest in the privacy of their social media accounts and whether they have a reasonable belief that if they make something private on their accounts, if the employer is going to be able to go through and look at it and use that for disciplinary purposes. While that may not have been the case before this order, this order comes out and says that it is the case. So there's been a whole time frame that has passed when that has not been the understanding, and now that has to be the understanding based on the sheriff's admonition in the new order. As to the test itself, ALJ noted this as well. It doesn't just turn on whether the employee would reasonably construe language to prohibit Section 7 activity, but she also noted that where it's ambiguous to its application, it's violative if there is no limiting language protecting Section 7 activity. So here that would be Section 6 activity. Such as, and I would have to look at the RDO to give you specific examples of that, but such as... Illegal is the one I believe she used. I believe that's correct. So in any one of the appendix she discusses, and it's right before her conclusion to the law, she talks about, the Lafayette Park Hotel was the other case that I was referencing that I couldn't remember. She talks about whether prohibited, unlawful, or improper conduct, and it's left up to the employee to guess. The issue comes here is where an employee just doesn't know one way or another. If there's no protection, express protection of the right, then it leaves the employee in a predicament, and that was evidenced by the union's witnesses who said, well, we don't know if that could result in discipline one way or another, but talking about understaffing or work conditions, that very well may result in discipline. We just don't know. All right. Counsel, sum up, if you would, please. Yes. So in writing that, we would urge this court to adopt our arguments, specifically with respect to the board's dismissal of the ALJ's findings on violations of Sections 10A4 and 10A1 for the gang order, and with respect to the ALJ's ruling on Section 10A1 with respect to the social media order. The board simply didn't apply the appropriate test on that, and for those reasons and all others outlined in our brief, we would ask that you rule in our favor. Thank you. Thank you. Sir. Good morning. Andy Creighton, assistant state's attorney on behalf of the sheriff and the county. The sheriff's position on actually raising one of the questions you asked is, as a matter of law, it's not subject to bargaining, because it's so fundamentally connected with his duties in regards to the peace and in regards to the duties of custody in the jail and the courthouses. Are we talking about the gang order? Talking about the gang order, not the rule of conduct. Among other things, yes. So we're talking about the gang order first. Yes, we are. There's no connection at all to conditions of employment? The sheriff's position on this is the only change that's acknowledged in this record is the filling out of the form in regards to what the officers have to biannually fill out or all the employees have to biannually fill out, and that doesn't change anything that's always been prohibited. You can't be a gang member or you can't be affiliated with criminals. That hasn't changed. Well, doesn't it change the persons that they may not associate with? It talks about people who have tattoos. If you have a gang tattoo, that's a person you can't associate with. It doesn't say a gang tattoo. It says one or more of the following things. Shares common symbols, tattoo, graffiti, blah, blah. But they would still have to know that it was a gang member. They would know or should have known. Or should have known. That's correct, Judge. And the alternate position is that, in fact, if it's subject to bargaining, and it's clearly within the bargaining is the interests of the sheriff and the protection of the citizens of the county as well as the custody of the jail and the courthouses clearly outweighs the interests of the union in this case. But it's beyond the person, though. It includes family members. Yes, it does. And other persons who are not technically gang members. Yes, it does. So the range is a lot more than it used to be. Well, it does say family members, and it didn't say that before. I agree with that. It does. It's a concern with the fact that all the correction officers and all the employees are citizens of Cook County and the great majority of detainees at the jail are citizens of Cook County. So there's a real concern there the sheriff has. So is the sheriff willing to bargain on this or not? Yes, the sheriff never refused to bargain. The sheriff is always interested in hearing the position of the union on any issue. The sheriff did implement the rule without bargaining. Absolutely. But the sheriff's not interested in waiving his fundamental rights to protect the citizens of Cook County and maintain security of the jail and the courthouse as a matter of bargaining. But he's always willing to listen, and he's always willing to listen to what the union has to say about any issue. But again, without urgency, why would they implement an order without, if you agree it's suitable for bargaining, just bargain about it first? The sheriff doesn't have to wait, Judge, until there's some tragedy that occurs. If he's decided at this point, he reads the newspapers, he sees the TV, just like everybody else does. If it's a term or condition of employment, then the sheriff does have to wait, generally speaking, correct? I mean, assuming you lose the central city's test, you have to wait, correct? That is correct. If you lose the test, my position is clearly, as the board pointed out, the majority opinion of the board, the interest of the sheriff in the protection of the county well outweighs the interest of the union in bargaining on this issue. So we don't even look at the third prong of the central city test? We don't have to get there, is that what you're saying? Right. The bargaining outweighs, just clearly does as the board found. And they were right on the statute, the gang terrorism statute. The board cited that, and they can take judicial notice of the legislative facts that have been announced by the legislature. And in this record, there was evidence of problems in the past, both by General Counsel Cramer for the union, as well as even the union witnesses acknowledged that those issues had come up in the past. Well, didn't somebody call them sporadic over a year? Yeah, there wasn't a great deal of detail on a lot of it, but it happens. And how many times does it happen before it's a problem? One time is a major problem. Any one time could lead to a tragedy. So it's an issue of vast importance. All right. The union attorney sent an email that demanded, this is from January of 2013, to Bargainer, requested the gang order in Mills County be held in abeyance. There was no response from your office, was there? Yes, let me say, they're always willing to have it on the table, and I believe it was an email back from the sheriff saying, raise the issue and we'll talk about it. So you say there was an affirmative response that, yes, we will? Yeah, they never denied to talk about it, no. All right. Counsel, as far as the rules of conduct and order? We rely on the reasoning of the board. This rule has been in effect since 1998. There's absolutely no evidence in this record that there's been anybody's right or curtailed, that the union rights have been curtailed by the sheriff in regards to the order that's been there since 1998. But the union is correct, are they not, that now that social media is clearly covered, the possibility of something somebody said that was protected speech being picked up is so much greater. Somebody complaining to their family about the sheriff's office is not likely to lead to discipline. Somebody complaining on the Internet is. There isn't any question that social media is impacted everywhere. It's all we have to do is look at it from the presidential election. We don't have to go there. But the chances of discipline, we're in a whole new world. Right. Isn't that a reasonable obligation of the sheriff then to alert his employees that they better look out? You know, they've got to be careful. Why do we not use the Lutheran heritage analysis here at counsel? Yeah, just because the order's been in there since 1998. The order's been there for years and years, and nobody's been denied any rights on it. So why would the sheriff have to be concerned about it at this point? Well, whether it's unlawful on its face. I mean, is there a chilling effect to someone's protected right? Absolutely not. I mean, there's no evidence in this file that the regulation that's been there all those years ever had a chilling effect on anyone. Well, were the questions ever asked at the hearing? No, it didn't come up. Is there an alternative framework that you suggest if we don't or shouldn't rely on the Lutheran heritage? No, I have no alternative language to suggest. I think it's appropriate for the sheriff to advise his employees that they have to be careful when they're on the Internet as to the same rules apply. I don't think the union disagrees that the Internet needs to be considered, but what are you suggesting are the limits on the sheriff's impairment of protected speech by unions? They're the same limits that always existed. There's nothing new on the limits. They have a right to organize. They have a right to complain about working conditions. They always had those rights, and those haven't changed. They always had the right to concerted activity about other matters. All right, Kelsey, do you want to sum up your argument then? Yes, thank you very much. I think the majority board opinion is just very clear both on the issue of the social media, but more importantly on the issue of the so-called gang war. It's clearly the interests of the sheriff outweigh the interests of the union in this case. One tragedy would be one too many. Thank you. Let me ask you, do you have any comment on the dissenting board member? Other than I don't have any particular comment on it other than I obviously disagree with him. Okay, thank you, sir. Thank you. Excuse me. May it please the court. I'm Assistant Attorney General Aaron Dozman, and I represent the board. The board's determinations with regard to the gang order and the social media provision were not clearly erroneous. The first part of this case involving the gang order. Let's talk about the standard of review because we have the ALJ who made factual findings that the board never disagreed with, and now you're asking us to defer to the board on factual findings or facts applied to law findings, and I'm a little confused how that standard applies here where we have factual findings that go contrary to what the board did. The ALJ's factual findings stand by her application of those facts and law. So that's where we defer to the board? The only decision on review is the board's decision. Applying those facts. Applying the facts, yes. There were no disputes on the facts in this case. Well, she did make a factual finding, didn't she, that the sheriff refused to bargain? Yes, that the board didn't, wasn't critical to the board's analysis. That was initially the sheriff, but yes. We give some deference to the board. It's not complete deference, is it? Correct. Clearly erroneous is a highly deferential standard, but the critical finding in the gang order is the application of the central city test, and what the board determined in that test was that the gang associations is at the core of the sheriff's function to provide safety and keep the peace, recognizing that the sheriff is on one side of the law and gangs on the other side of the law. And the sheriff is allowed to enact regulations on that subject without bargaining it. The teamsters have mounted their challenge with its perceived burdens from the order, which really speak to the effects of the order and not the subject itself. And that's why they're conflating the effects in discipline, the should-have-known standard, that applies. Counsel, do you think this gang order has anything to do with conditions of employment? The board is silent on that. It's implied that it does. It carries with it discipline, so that's a term or condition of employment. All right, so the third prong of central city would have to apply here. Yes. So you differ from your co-counselor. Yes, the board applied the second and third steps of the central city test. So we weighed the benefits versus the burden of bargaining. The benefits to the decision-making process against the burden of bargaining. Do you agree with your opposing counsel that the benefits to the decision-making process also include the impact on the employees, that that's part of the decision-making process? No, burdens alone are not relevant under the analysis unless they frame them in a way to make it a benefit to the decision-making process. I don't know what that means exactly. Does it mean just we want to come up with the best rule possible or we want to come up with a rule that everybody can live with? Well, typically under the test, it exists so that if the employees know something that the employer doesn't or they have some particular knowledge on an issue, they can come to the table, they can say we can offer you these recommendations to make, you know, your core function of keeping sheriffs and gang members on separate sides of the law, this would be more effective. If they presented that, that would be a benefit they could weigh against the burden of bargaining. And that's not what they did here. They focused on burdens in paperwork and burdens in this investigatory burden. Are they concerned about discipline? Yes, they're concerned about discipline in this should-have-known standard, but again, that's not. And you say that's all not part of the balance. It's really not part of the central city analysis. If they recrafted that, if they connected somehow the burden to a benefit they could offer, then that would be something that the board could weigh against the burden of bargaining. And we've identified why, you know, the problems with pointing to burdens in paperwork, the form itself, it's in the record, it's not wrong. The investigatory burden, there's no basis for that in a should-have-known standard. When you talk about investigatory, are you talking about the employee having to investigate who these people are and who all the family members know and all that? Is that part of the analysis? It's not part of the analysis. And I think the reading that should-have-known requires that you go out and actually investigate your family and close associates. It has no basis under the should-have-known standard. But if they were able to connect the benefits to the decision-making process, then we would have a case to weigh. And I think that was inherent in the board's decision. And the core function in this case is the sheriffs. It's the reason they exist, is to keep the gang members on one side and the sheriffs not becoming gang members. Let's get to the social media. Sure. The social media provision, it was the only addition that is at dispute, is a provision that says be aware that the rules of conduct apply just as they would anywhere else, and that includes the Internet. And what the board found is that that provision doesn't regulate conduct. There's no new conduct regulated. It's a reminder saying the rules as they've always existed, they exist online in case you- But the rules regulate conduct already. Correct. There's the existing conduct provision that regulates unadopted conduct. It says don't discredit your employer and all that. Even if there's nothing new, they can bring a challenge to that as imperious protected speech, correct? Even if it's as old as the hill. I think they've laid that under Section 11. You only get six months to- You didn't make a timeliness argument to their challenge here. You've agreed that this rule is being timely challenged, even if this rule in part incorporates something that's been in effect for a long time. The challenge is specifically to the social media provision. That's the new provision. Okay. And it doesn't regulate conduct. To the extent they're trying to backdoor into an existing provision, they can't challenge that. Okay. Well, the ALJ brought up the whole issue of the conduct going to be coming, correct? Correct, yeah. And the board, what was their opinion on that? The conduct going to be coming, is that part of the analysis or not? Well, they first determined that if you don't regulate conduct, it's unreasonable to think that it regulates conduct. To the extent they're challenging the conduct rule that has always been the rule, then, well, it's forfeited. But also, this has existed forever, and you can't- it didn't morph, it didn't change, so you can't really, out of the blue, without evidence or anything, say that it has changed in any way. We can certainly, I mean, the board did, it sounds to me, and I don't know why we can't, look at that rule in the context of social media, which is what the sheriff has done. He said, look at your- all these rules that apply, they apply in the social media context. And the board looked at it that way, and we can look at it that way, correct? You're not saying that it's an untimely challenge. It's not untimely to that particular- Okay, but you're not saying that it doesn't regulate conduct. It does regulate conduct on media, on social media. It does not regulate conduct. Paragraph 3 does- It incorporates other rules that regulate conduct. Yes. There you go. It's reminding, saying, beware that conduct on and off duty extends to electronic social media and networking sites, and that all rules of conduct apply when engaging in that activity. Okay. Counsel, do you want to sum up? Sure. We ask that you affirm the board's decision. Thank you. Thank you very much. Counsel, a few minutes, please. Okay. Your Honors, I want to start by just highlighting the fact that, yes, it's true, the ALJ did issue a factual finding that the sheriff refused to bargain. So the question is, if the sheriff refused to bargain prior to unilaterally implementing, is that an unfair labor practice? We submit that it absolutely is. The Central Cities Analysis turns on the balancing test. Counsels for the defendants have indicated their belief that the balancing test does not pertain to the burdens on employees. We disagree. The sheriff has an obligation to bargain under the Labor Act, both as to the decision to implement a policy and to the effects on the employees. And I have a case citation for you. It's in my brief. But it's CTA versus ATU, 299, ILAP 3rd, 934, at page 940. It's a 1998 case. The sheriff had an obligation to absolutely bargain both as to the decision and to the effects. As to whether the balancing test turns to the benefits to the decision-making process or the benefits or relative burdens on the employee and how that pertains to the decision-making process, if the board was suggesting that they didn't have to bargain as to either the decision or the effects, they should have made that clear. They did not make that clear one way or another. They did not really even conduct a balancing analysis at all. They turned to the Illinois Street Gang Terrorism Omnibus Prevention Act, which, frankly, that's not their statute to apply. While they are owed deference as to their interpretation of their own enabling statute, Your Honors, they are not owed as much deference with respect to their interpretation of an entirely unrelated statute. And they elevated that above their own enabling statute here in discharging the sheriff of its obligations to bargain over the gang order. As to the new or should have known, if there was no investigative burden on the employees, if it was innocuous, as the defendants have sort of claimed, why was there any burden for the sheriff to sit down and talk to us about it? There wouldn't have been any burden on them at all. Now, there is an issue as to does it apply to neighbors? Does it apply to somebody that you met on Match.com and went on one date with? If you see them with a crown tattoo, are you supposed to know that they're a Latin king or a Latin queen? What do you have to know in order to have to disclose somebody under this order? What do you have to know? What instructs you that you should have known that they had a gang affiliation? And what does affiliate mean? These are issues that we could have brought up to the sheriff that could have benefited the decision-making process, even if this court does take the same position as the defendants that that is the appropriate area of inquiry. As to the social media provision and the intimation that it doesn't regulate conduct, as ALJ stated, it doesn't regulate conduct on its own. But when you pair it with the rules of conduct order on the whole, it certainly does regulate conduct. And just to give you a sort of baseline for that, it regulates speech. If you look to the supplemental appendix in the sheriff's brief at page 21, in the brief, Mr. Creighton gives you a number of areas of sort of specificity, the way that this can be nailed down so that the employees are clear on what their obligations are on social media. Paragraphs 9 and 10 state they shall not use threats or coercion, okay, but they should not engage in abusive, coarse, violent, profane, harassing, or insolent language or gestures. What's insolent to me may not be insolent to you. What's profane on social media and what's profane in the workplace may be totally different things. So I'm going to wrap up here by pointing out that Mr. Dozman raised an issue about whether we've waived our rights to challenge the rules of conduct order under Section 11. If that's their position, then the social media provision has extended our timeline to raise that issue. And that's what the ALJ found here by saying that the maintenance of the work rule was unlawful. Thank you for your time. Thank you. Thank you very much, ladies and gentlemen, for your arguments here today. We will take this case under advisement.